POST et al. v. EMBRY. (No. 1274.)

(Court of Civil Appeals of Texas. Amarillo. May 22, 1918. On Motion for Rehearing, June 29, 1918.)

1. PUBLIC LANDS ⬤175(7) — OVERLAPPING SURVEYS—PRIORITY OF RIGHT.

Where a section of school land was patented before the occupant of an overlapping section of school land had acquired any right and the field notes of the patented section embraced within its calls the overlap, the patentee's right was superior to that of a subsequent purchaser of the other section.

On Motion for Rehearing.

2. BOUNDARIES ⬤37(5) — AGREED LINES — EVIDENCE.

In an action to determine title to an overlap of two sections of school land, evidence *held* not sufficient to establish a boundary line by agreement.

Appeal from District Court, Lubbock County; W. R. Spencer, Judge.

Suit by H. H. Embry against C. W. Post and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered, and rehearing denied.

---

Jno. P. Marrs, of Quanah, and Beall & Douthit, of Sweetwater, for appellants. W. H. Bledsoe and R. A. Sowder, both of Lubbock, for appellee.

BOYCE, J. This suit was brought by H. H. Embry, appellee, against C. W. Post, to recover 480 acres of land in Lynn county, described as the west three-quarters of section 16, block J. The defendant disclaimed except in so far as the location of said land might conflict with surveys 1265 and 1274, block 8, owned by defendant, and as to such land as might be in conflict claimed the superior title. Pending the trial C. W. Post died, and appellants, being his heirs, were made parties defendant. The issues developed on the trial and brought forward on this appeal were: First, whether upon proper location of said respective surveys there was any conflict; second, whether in such event the plaintiff or defendants had the superior right to the land in conflict. The following disposition was made in the lower court of these issues: The jury found as a matter of fact that there was a conflict between a part of the west three-quarters of section 16 and sections 1265 and 1274; second, the plaintiff admitted that as to that part of the conflict with section 1265 the defendants had the superior right and took nothing as to said part, but the court determined that the plaintiff's right was superior to that part of sections 16 and 1274 in conflict, and entered judgment accordingly.

Since we dispose of the case by our holding on the questions raised by the second issue, it will not be necessary to refer to the assignments presented in connection with the first, nor make any statement in connection therewith except to say that the controversy was not as to the correct location of sections 1265 and 1274, as the facts as to their location seem undisputed, and the judgment itself in disposing of that part of 1265 which lay to the north of 1274 is based on these facts. The controversy as to the conflict arose out of appellants' contention that plaintiff's alleged location of section 16, so that it was thereby placed in conflict with 1265 and 1274, was incorrect. So that in disposing of the case we will assume that a partial conflict between the west three-quarters of section 16 and section 1274 does exist, and that 16 should be located according to plaintiff's contention and the judgment of the court, and 1274 according to appellants' contention and the corners as established by surveyors Twitchell and Marhoff.

Sections 16 and 1274 were both surveyed by the same surveyor, as full 640-acre square sections. Section 16 was the prior survey, being surveyed according to statement in its field notes on April 5, 1878, while section 1274 was surveyed May 15, 1878. Neither of the surveys can be located by original corners of their own; it being necessary, in order to locate the surveys on the ground, to connect back by course and distance calls through connecting surveys to distant corners. Both surveys belong to the public school fund of the state and were sold as such. Survey 1274 was patented on March 17, 1902, the patent describing it by the original field notes. The official maps on file in the land office at this time did not show any conflict with section 16. The map adopted in the land office in July, 1902, does, however, show a partial conflict between section 16 on the east and 1274 on the west, and from the fact that the part of the land in conflict embraced within the boundaries of section 16, as shown on this map, is inclosed in dotted lines, we suppose that it was the assumption of the land office that 1274 would be superior as to the land in conflict. The exact extent of the conflict is not shown, though from the scale of the map it appears to include approximately the east one-third of said section 16. The west three-quarters of said section was awarded to R. E. Penny, through whom Embry claims, on February 26, 1903. Application was made to purchase the entire section, but only the west three-quarters was awarded on account of the conflict with section 1274. Not enough was allowed for the conflict, however, as it developed on the trial that it involved a little more than the east one-third of section 16. It thus appears that plaintiff and defendants have both bought from the state the same land, it being embraced within the boundaries of each of the two surveys sold separately. Both sales were for the benefit of the same fund. The plaintiff is the junior purchaser of the senior survey, and the defendants are the senior purchasers of the junior survey. The question for our decision is, Who should prevail under these facts?

We have been referred to no authority which we think are directly in point on this question. There are many authorities which hold that the inception of title relates back to the survey or the location, where the location preceded the survey, and in case of conflict the holder of the senior survey should prevail, though the grant from the state to the junior survey is prior in point of time. In all of these decisions, so far as we have examined them, it appears that the original locations were made for different interests. The reason and justice of these holdings in such a case are clear. While the locator prior to the patent may not have acquired title to the land, yet he has acquired a right to purchase upon compliance with certain conditions. By his location and survey the the particular land subject to his right is segregated from the public domain, and a public record made of the segregation. The patent then is a consummation of the locator's right to the grant, and the locator and those holding under him should be protected in his rights from the time of the notice to the public through the public records of the segregation of the particular lands for the

purpose of subjecting them to the right of purchase by the locator. This case is distinguishable from the facts in any of these cases, in that the right under either location is vested in the public free school fund. Appellees rely particularly on the cases of Ellwood v. Stallcup, 57 Tex. Civ. App. 343, 122 S. W. 906, and Elwood v. Copeland, 61 Tex. Civ. App. 238, 129 S. W. 146, as supporting the judgment. In the first case the conflict was between a survey located for the benefit of the public school fund and a county school land survey. The public school survey was prior in location, but the county school survey was patented to the county before the public school survey was sold. It was held that the purchaser of the public school survey acquired the better title. We do not think the case supports the appellee's contention; rather, in the emphasis which the court places upon the fact that the ownership of the surveys was different, one being in the public free schools of the entire state and the other being in the county for the benefit of the schools of the particular county, there may appear an inference that if the ownership had been identical the conclusion would have been different. The facts are not set out in Elwood v. Copeland, 57 Tex. Civ. App. 343, 129 S. W. 146, with sufficient fullness to permit us to say definitely that the two surveys in conflict were not both public school surveys, though we infer that the junior survey (section 163) was not a public school survey. If this inference is correct, it would be clear that the prior survey of section 4, being the survey in conflict with said section 163, for the benefit of the public school fund, segregated it from the public domain, and prevented its subsequent diversion by the state to other purposes. Section 2, art. 7, of the Constitution, provides that:

"All the alternate sections of land reserved by the state out of grants heretofore made or that may be hereafter made to railroads, etc. * * * shall constitute a perpetual public school fund."

Upon the segregation of the land by survey the right of the school fund attaches, and the state becomes trustee to dispose of it for the benefit of such fund without the power to divert it to other purposes. Either survey in this case would be effective to prevent a location of the land for the benefit of any other person or fund; but, as they both locate it for the benefit of the public schools, it would not seem important whether it is sold as a part of the one or the other survey. Appellee's right had not attached in the land prior to its sale to appellants' grantors; and, unless there is something in the law that requires the sale of the land only as a part of the first survey and makes invalid its sale as a part of any other, it ought to be the law that the one first acquiring the right to the land should hold it over those acquiring rights subsequently. There does not appear to be any express

provision of statutory law that limits the power of the land commissioner to sell the land only as a part of the first survey, and there are some decisions that recognize the right of the land commissioner to make sales on field notes other than those of the original survey. In Millar v. Ward, 124 S. W. 440, the suit was between the purchasers of two school surveys, sections 12 and 38, in the same block. Section 12 was sold first. Prior to its sale a survey was made, which was supposed to be in accordance with the original location, corners put in, and it was patented on the corrected field notes in accordance therewith. It was later demonstrated that the corrected field notes of section 12, upon which it was patented, embraced some land not included within its original field notes if correctly surveyed, but a part of section 38, as originally surveyed. The subsequent purchaser of section 38 claimed that he was entitled to have the two surveys "adjudicated, as being as they were in fact located by the original surveyor." This claim was denied, and the law was thus announced by the court:

"We are not cited to any statute which restricted the power of the state or commissioner of the general land office, in regard to school lands, to the granting of a particular section as the same was actually made by the surveyor who originally made and platted the same. Such a provision would be inadvisable, if not impracticable. * * * There is no mistake as to what land was patented for No. 12, and the land so patented, all of which represented school land, which no other person had any right or interest in at the time, was placed beyond the reach of subsequent applicants, upon the well-settled principle that only the state has the right to inquire into matter affecting the patent which do not involve the power of the officer to grant the patent."

In support of the proposition of law announced by the court in the concluding clause of the above quotation, see Frontroy v. Atkinson, 45 Tex. Civ. App. 324, 100 S. W. 1024, and authorities there cited.

[1] It was held, even prior to express legislation granting the authority, that the land commissioner might "correct errors in surveys after the field notes have been returned into the general land office." Smith v. McGaughey, 87 Tex. 61, 26 S. W. 1074. True, no corrected field notes were filed here, but the original field notes of section 1274, upon which the land was patented, were sufficient to embrace the land in controversy. When, prior to the sale of section 16 it was discovered that sections 1274 and 16 were in conflict, the Land Commissioner, by the adoption of the official map of the county, recognized the superiority of the right of the patentee of section 1274 to this land. This was nothing but common justice. The school fund to which the land belonged had been paid for it, and no one else except the school fund and its patentee at that time had any interest in it. There was no necessity for the filing of corrected field notes of section 1274, but the correction should have been

in the field notes of section 16. The purchaser of section 16 had actual notice that there was a conflict between said section and section 1274, and that the land office was recognizing the superiority of the claimant of section 1274 to the land in conflict, though perhaps both he and the Land Commissioner were mistaken as to the extent of the conflict. We think, therefore, that since 1274 was patented at a time when the appellee had acquired no right to the land and the field notes of said patent embraced within its calls the land in controversy, the patentee's rights ought to be superior to one subsequently purchasing such land as a part of section 16. The land is as effectively appropriated by patent on the original field notes as it would have been by patent on corrected field notes, and we think the holding in the case of Millar v. Ward, supra, thus supports our conclusion.

The judgment will be reversed and rendered in accordance with these conclusions.

HUFF, C. J., not sitting, being absent in Austin, sitting with committee of judges.

### On Motion for Rehearing.

BOYCE, J. [2] On motion for rehearing appellee contends that the record discloses that the boundary line between appellants' and appellee's land was established by survey on the part of the owners of sections 1274 and 1265, followed by the building of a fence thereon, which was recognized as the boundary line for many years, and which thus constituted a boundary line by agreement. The evidence referred to in support of this contention is to the effect that Lofton, the agent for the Llano Live Stock Company, under whom appellant claims, in the year 1903 had a survey made for the east lines of section 16 and other surveys in block J to the north and south of it, and that he soon thereafter built a fence along such line. It seems that section 16, and we assume also the lands to the east of it, was in the pasture of the said Llano Live Stock Company. It does not appear just what, if any, lands were owned by the said Live Stock Company, nor whether said fence was erected as a dividing fence between different pastures of the said company, or as a division fence between the pasture of said company and other persons. Appellee testified that Lofton subsequently gave him permission to tie his fence onto this fence, supposed to have been built on the east line of section 16. The line referred to was evidently run for the east line of section 16, with its full complement of 640 acres. The appellee and those under whom he holds only bought from the state the west three-quarters of section 16, so that in no event could it be said that this fence was supposed to be on the boundary line of appel-

lee's land. There was no pleading of establishment of the boundary line by agreement or estoppel, though this perhaps was not necessary to a raising of the question. Eddie v. Tinnin, 7 Tex. Civ. App. 371, 26 S. W. 732. The court submitted no such issue to the jury, and the case does not seem to have been tried as if any such issue was in it, and we do not think that the evidence is sufficient to raise an issue of establishment of the boundary by agreement or acquiescence.

Other propositions presented in the motion for rehearing have already been disposed of by our former opinion. We do not regard our holding as being in conflict with the cases of State v. Post, 106 Tex. 468, 169 S. W. 407; Id., 169 S. W. 405; Id., 106 Tex. 500, 171 S. W. 707. Those cases simply held that a resurvey could not be made to embrace land not embraced in the original field notes or location. The field notes of section 1274 do embrace the land in controversy, though it may be also included within the field notes of section 16.

The motion for rehearing is overruled.

HUFF, C. J., not sitting, being absent in Austin, serving on committee of judges.